SLIP OPINION

Cite as 2014 Ark. App. 644

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-14-146

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered** NOVEMBER 12, 2014 |
| ANDREW HOLLAND | | APPEAL FROM THE PULASKI |
| | APPELLANT | COUNTY CIRCUIT COURT, |
| | | SEVENTH DIVISION |
| V. | | [NO. 60CR-11-1159] |
| | | |
| | | HONORABLE BARRY ALAN SIMS, |
| STATE OF ARKANSAS | | JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## KENNETH S. HIXSON, Judge

After a jury trial in October 2013 in Pulaski County Circuit Court, appellant Andrew M. Holland was found guilty of committing first-degree sexual assault against one teenage boy (XB)[1] and second-degree sexual assault against another teenage boy (JD).[2] Appellant was sentenced to concurrent prison terms, forty and thirty years respectively, for an effective prison term of forty years. A judgment was filed in November 2013, from which appellant filed a timely notice of appeal.

_____

[1]XB was born in July 1993. XB was alleged to have been sexually abused between February 2006 to February 2008, when he would have been thirteen to fifteen years old. Based on appellant's date of birth in March of 1964, appellant would have been in his early forties.

[2]JD was born in May 1995. JD was alleged to have been sexually abused between September 2010 and April 2011, when he would have been fifteen years old. Appellant would have been in his mid-forties.

Appellant does not challenge the sufficiency of the evidence to support his convictions. Rather, appellant argues on appeal that the trial court abused its discretion with regard to three evidentiary rulings: (1) by permitting the State to introduce evidence of appellant's alleged prior bad acts pursuant to the "pedophile exception" to Arkansas Rule of Evidence 404(b); (2) by excluding evidence of each victim's prior sexual conduct pursuant to the rape-shield statute, Arkansas Code Annotated section 16-42-101; and (3) refusing appellant access to JD's inpatient psychotherapeutic-treatment records, where the trial court deemed those records to be privileged pursuant to Arkansas Rule of Evidence 503. A trial court has broad discretion in making evidentiary rulings and will not be reversed absent an abuse of that discretion. *Allen v. State*, 374 Ark. 309, 287 S.W.3d 579 (2008). The State asserts that appellant has failed to demonstrate an abuse of discretion or any clear error. We affirm.

To place these trial court rulings in context, we discuss the substance of the testimony given at trial by XB, XB's mother, JD, and JD's mother. XB testified that he was presently twenty years old, and he knew appellant, who he called "Andy," because Andy was his mother's friend and a neighbor of theirs when XB was a boy. XB stated that appellant would discipline him or babysit him when his mother was at work; he acknowledged that his mother was unable to handle him. XB said that when he was age thirteen to fifteen, Andy sexually abused him when he visited Andy's house.

XB said that on one occasion Andy asked him to come to his bedroom and to sit with him, and after XB complied, Andy began rubbing his (XB's) leg. XB said that Andy put a pornographic DVD on television and then told XB to get undressed and to get into bed with

SLIP OPINION

him. XB described to the jury that he felt Andy move toward his body from behind in the bed, felt him grab his (XB's) penis and masturbate him, and then felt Andy's penis penetrate his buttocks. After a few minutes, Andy informed XB that he (XB) had a "big d★★k," leaving XB in the bedroom with a bottle of lotion and instructions to "finish up." On another occasion, XB said that he went to Andy's house where Andy asked to watch XB masturbate, and he complied but would not make eye contact with Andy.

XB said that his mother requested Andy to discipline him for misbehavior, which Andy did by whipping him with a belt. XB added that Andy encouraged him to masturbate before school to see if it would help calm him down. XB was in and out of therapeutic homes and juvenile court during this time period. While in one therapeutic group home, he revealed the abuse to one of the house parents in charge there. XB was concerned that perhaps the sexual abuse was part of the reason he was misbehaving, but he regretted revealing the abuse when he realized that it would have to be reported to authorities. XB admitted that he lied when he told investigators that he was anally penetrated three times because it only happened once; he just wanted the investigator to leave him alone.

XB's mother Danetta Thompson testified that XB's father was not in his life and had instead been in prison for about twenty years. Thompson held a job and was a single mother of three children. Thompson stated that she had known appellant for a long time and had dated him briefly; they remained friends after an amicable breakup. She testified that appellant helped her out with things like cutting the grass and with disciplining XB. She described XB as a struggling student who was always in remedial classes; he took attention deficit

3

medication for a while; he did not graduate high school until he was twenty years old. She said that as a young teenager, XB was noncompliant with basic chores and her house rules; he was engaging in high-risk behavior and lying to her. She said that XB got into more and more trouble as he grew older, so he was admitted intermittently to therapeutic homes and centers. While XB was in a therapeutic home, she was informed that he reported sexual abuse. Thompson said that her son was reclusive and did not like to communicate his feelings, so she was unaware of the abuse until the mandated reporter set things in motion.

JD also testified at trial; he was age eighteen. JD said that he was fifteen years old when he met Andy, seeking out Andy to manage him and help him become a successful rap artist. JD said that he first attempted to contact Andy by a Facebook message, to which Andy replied in the summer of 2010 and began to work with JD at his (Andy's) home studio. JD described Andy's house, with Andy's bedroom in the back on one side. Andy's house had another bedroom with a closet where the recording equipment was kept; a different aspiring rap artist lived in this bedroom. JD agreed that Andy taught him how to promote himself as a rap artist, and Andy even escorted him to New York in December 2010 so that JD could try out in a talent search for a television show. JD was at Andy's house often, basically whenever he was not attending school. He explained that at first, Andy only touched him randomly or in passing with thigh rubs, hugs, and other groping behavior. JD said that over time Andy progressed to "extreme touching," meaning JD's bare skin and including his penis.

JD described one time when Andy told him to come sit on his bed, kissed JD's cheek and neck, and then reached into JD's underwear to feel his penis and told JD that he had "a

4

big d★★k." JD said that he tolerated this behavior because he was so passionate about his rap music and wanted Andy's professional help. JD also testified that he kept all this secret because it was embarrassing and emasculating to be taken advantage of by this man.

JD described another time when they were sitting on Andy's couch and Andy pulled JD on top of him and touched JD's genital area; Andy also had JD put his hand on Andy's erect penis. He testified that Andy showed him pornography on a laptop computer. JD ended up in a behavioral health hospital, and when he was being processed for long-term care, he did not mean to but answered "yes" when asked if he had been sexually abused. He named Andy as the perpetrator. This started the investigation regarding JD and Andy. JD stated that it was not advantageous for him to tell about the abuse because it meant he had to stay in therapy for a longer period of time, and it ended his rap career.

JD's mother Jocelyn Davis met Andy some time around July 2010; she heard that appellant was a rap music producer who could help her son. She described Andy as a mentor to her son and a friend to her, helping her move, giving her money, and picking up her children from school when she needed it. Davis, having put Andy in a position of trust, expected Andy to act as a parental reinforcement and be the authority figure to her son, particularly because JD's father was not in his life. She said that Andy came to her house after XB's allegations came to light, telling Davis that XB was lying about this to get himself out of trouble. Davis testified that JD became progressively more defiant of her, and he had not yet revealed that Andy abused him too. On a night in October 2011, she said that she and her son had a physical confrontation about his defiant behavior, so she called the police on her

son. The choice at that point was to send JD to juvenile court or to a treatment center; they chose treatment. It was only after her son was in a treatment facility for a few weeks that she was informed by her son's therapist and an investigator that he reported sexual abuse by Andy. She reserved judgment on the truth of the allegations until after she saw and spoke with JD; she believed that he was telling the truth.

*Pedophile Exception to Arkansas Rule of Evidence 404(b)*

Appellant argued to the trial court, and now argues on appeal, that the trial court erred by permitting the State to enter into evidence the details of two 1989 convictions for committing sexually abusive acts on two teenage boys in California; the testimony of one of those boys (now an adult) explaining the factual basis of those convictions; and the testimony of three other boys (now adults) about appellant having sexually abused them when those boys were thirteen to fourteen years old. Appellant asserts that this information was not sufficiently similar or temporally close enough in time to the charges for which he was standing trial. He argues that his due-process rights were violated because the allegations were patently unreliable and unfairly prejudicial because of how long ago the alleged abuse occurred. Thus, appellant argued, the "pedophile exception" should not apply to permit admission of all this highly and unfairly prejudicial evidence.

The State asserts, as it did during trial, that this evidence was permissible by virtue of Arkansas Rule of Evidence 404(b) and Arkansas's "pedophile exception." Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be

SLIP OPINION

admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The list in Rule 404(b) of permissible purposes for which "bad acts" evidence may be admissible is exemplary and not exhaustive. *Hamm v. State*, 365 Ark. 647, 232 S.W.3d 463 (2006). These exceptions inure because such evidence is independently relevant and does not merely establish that the defendant is a bad person who does bad things. *Craigg v. State*, 2012 Ark. 387, 424 S.W.3d 264. Our supreme court has recognized a separate "pedophile exception" to the general rule that evidence of a defendant's prior bad acts cannot be used to prove that the defendant committed the charged crime. *Id.* The pedophile exception allows the State to introduce evidence of the defendant's similar acts with the same or other children when it is helpful in showing a proclivity for a specific act with a person or class of persons with whom the defendant has an intimate relationship. *Id.* The rationale for this exception is that such evidence helps to prove the depraved sexual instinct of the accused. *Id.* For the pedophile exception to apply, there must be a sufficient degree of similarity between the evidence to be introduced and the charged sexual conduct. *Id.* We also require that there be an "intimate relationship" between the defendant and the victim of the prior act, meaning a relationship close in friendship or acquaintance, familiar, near, or confidential. *Id.* For temporal proximity, we apply a reasonableness standard to determine whether a prior bad act remains relevant despite the passage of time. *Id.* The standard of review is abuse of discretion, meaning that the appellant must make a showing that the trial judge acted improvidently, thoughtlessly, or without due consideration. *Id.* *See also Allen v. State*, 374

Ark. 309, 287 S.W.3d 579 (2008); *Hamm v. State*, 365 Ark. 647, 232 S.W.3d 463 (2006). Viewing the present appeal under this standard, we affirm the trial court's evidentiary ruling.

We will address each component of evidence as presented in appellant's brief. First, appellant argues that MJ was wrongly permitted to testify as to alleged sexual abuse by appellant against him in Arkansas in 1999, when MJ was age fourteen. MJ was age twenty-eight at the time of trial. He testified that he knew appellant, who he called "Mr. Andy," as a neighbor who befriended him and paid him to do yard work. This interaction led to appellant asking MJ inside his home, where he eventually showed MJ pornographic movies, leading to MJ having an erection. At that point, MJ complied with appellant's desire to see MJ's penis, appellant performed oral sex on MJ, and he told MJ that he had a large penis. After that, MJ said that appellant took him to a bedroom, where he had MJ get on top of appellant and "hump him, hunch" him from behind and then switch positions so that appellant was on top of MJ. Afterward, he said that they redressed and then appellant gave him money and told him not to tell anyone what happened. MJ stated that he told his uncle and the police what happened. MJ admitted that he lied by adding details of being physically forced and threatened to do these sexual acts and he lied by not reporting the oral sex, explaining that he feared he would be in more trouble if he told the whole truth.

Appellant argues that MJ's testimony was "patently unreliable," too remote in time, and unfairly prejudicial where there was other pedophile-exception evidence before the jury. We disagree. The temporal span of years is reasonable. This allegedly happened in 1999; appellant was accused of sexually abusing XB between 2006–2008 (approximately seven plus

years later) and JD between 2010–2011 (approximately eleven to twelve years later). The sexual abuse and the adult-male-mentor relationship was very similar to the sexual abuse and mentor relationship described by XB and JD. Whether MJ was credible or reliable was for the jury to decide. We hold that the trial court did not abuse its discretion in permitting MJ to testify under the pedophile exception.

Appellant argues that the testimony of JG and JP, as well as the California convictions, should have been excluded due to temporal remoteness (dating back to 1988–1989) and due to dissimilarity with the charged acts. Appellant contends that at the very least, the trial court should have limited this evidence to alleviate the overwhelming prejudice to appellant. He argues that the trial court's ruling to admit so much pedophile-exception evidence equated to a violation of his rights to due process. We disagree that the trial court abused its discretion.

This evidence showed appellant's proclivity for sexual acts with young teenage, typically African-American, males who were financially disadvantaged and from fatherless homes. This evidence almost uniformly showed that appellant gained the trust of each victim's female parent, provided monetary and disciplinary assistance to the parent and victim when the victim was approximately thirteen years old, and would then escalate his contact with the victim by isolating and then sexually abusing the victim. The sexual abuse perpetrated on each boy was consistent as well—ranging from sexually charged comments about the victim's penis size to inappropriate touching and then to masturbating as well as having oral or anal sex with the victim. This is precisely the kind of evidence contemplated

by our state's "pedophile exception," and none of it was so far removed in time or so dissimilar from the charged acts to render it inadmissible. *See Rohrbach v. State*, 374 Ark. 271, 287 S.W.3d 590 (2008); *Lamb v. State*, 372 Ark. 277, 275 S.W.3d 144 (2008); *Swift v. State*, 363 Ark. 496, 215 S.W.3d 619 (2005); *Flanery v. State*, 362 Ark. 311, 208 S.W.3d 187 (2005); *Hernandez v. State*, 331 Ark. 301, 962 S.W.2d 756 (1998); *Morrison v. State*, 2011 Ark. App. 290. We affirm the trial court's exercise of discretion in admitting this evidence because neither an abuse of that discretion nor a due-process violation has been shown.

*Rape-Shield Evidence*

Appellant next contends that he was not allowed to present an adequate defense, depriving him of constitutional rights, because the trial court denied him the ability to demonstrate that the victims had motivation to fabricate these sexual-abuse allegations. Specifically, appellant asserts (1) that XB was diagnosed with a penile abscess within a week or two of making his "false accusation" against appellant, and his reports of sexual abuse were motivated by XB's desire to deflect attention from his own sexual activity and associated embarrassment; and (2) that JD's allegation of sexual abuse by appellant was motivated by JD's desire to disprove any allegation that he was homosexual. The State counters that what appellant sought was specifically disallowed by the Arkansas rape-shield statute, Arkansas Code Annotated section 16-42-101 (Repl. 1999), particularly subsection (b), which disallows evidence of a victim's sexual history for the purpose of attacking the credibility of the victim, establishing a defense, or for any other purpose. We agree with the State.

SLIP OPINION

The rape-shield statute's overall purpose is to shield victims of rape or sexual abuse from the humiliation of having their personal conduct, unrelated to the charges pending, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt. *Joyner v. State*, 2009 Ark. 168, 303 S.W.3d 54; *Bond v. State*, 374 Ark. 332, 288 S.W.3d 206 (2008). The trial court is vested with a great deal of discretion in determining whether the evidence is relevant, and we will not overturn the trial court's decision unless it constituted clear error or a manifest abuse of discretion. *Parish v. State*, 357 Ark. 260, 163 S.W.3d 843 (2004). Even if relevant, this evidence is not admissible if the probative value is outweighed by its inflammatory or prejudicial nature. *Hathcock v. State*, 357 Ark. 563, 182 S.W.3d 152 (2004).

After a hearing on this request by the defense, the trial court ruled that there would be no discussion of the victims' sexual history. This was proper. The rape-shield statute prevents this type of evidence, even where the defense complains that the victim's sexual history bears on the motivation to fabricate and bears on credibility, allegedly impeding appellant's constitutional right to present a defense. *Hathcock v. State*, *supra*; *Turner v. State*, 355 Ark. 541, 141 S.W.3d 352 (2004); *Butler v. State*, 349 Ark. 252, 82 S.W.3d 152 (2002); *Gaines v. State*, 313 Ark. 561, 855 S.W.2d 956 (1993); *Hill v. State*, 74 Ark. App. 28, 45 S.W.3d 406 (2001). We affirm on this evidentiary ruling as well.

*Psychotherapist/Patient Privilege*

Lastly, appellant argues that the trial court abused its discretion in refusing to require the State to produce JD's treatment records from Rivendell, a behavior health service center

11

where he was admitted for treatment. Appellant concedes that the trial court conducted an in camera review of the records in order to determine whether there was any exculpatory evidence to disclose to the defense and reported that there was none. Even so, appellant argues that he had the constitutional right to review those records and use any inconsistencies to attack JD's credibility, overriding any patient/therapist privilege. We disagree that the trial court erred.

A witness, particularly a sexual abuse or rape victim, does not waive his Arkansas Rule of Evidence 503 patient privilege by testifying in a criminal proceeding; the party is the State, not the victim. *See State v. K.B.*, 2010 Ark. 228, 379 S.W.3d 471; *Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000); *Castrellon v. State*, 2013 Ark. App. 408, 428 S.W.3d 607. A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the State's files. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). The defendant's and State's interests in ensuring a fair trial can be protected fully by requiring that the privileged files be submitted only to the trial court for an in camera review. *Id.* at 60. Here, just such an in camera review was conducted, more than once to be thorough, at defense counsel's request. We note, though, that even if the trial court erred by not allowing appellant access to JD's treatment records, our supreme court has held that the psychotherapist/patient privilege is more important than a defendant's need for probative evidence; the privilege is not overridden by a defendant's constitutional right to present a defense. *Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000). We affirm on appellant's last point on appeal.

In conclusion, we affirm appellant's convictions for sexual abuse in the first and second degree.

WHITEAKER and BROWN, JJ., agree.

*Lassiter & Cassinelli*, by: *Erin Cassinelli*; and *Jeff Rosenzweig*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.